# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

**Civil No. 13-3579 (JRT/FLN)**

ARCTIC CAT, INC., *a Minnesota Corporation*, and ARCTIC CAT SALES INC., *a Minnesota Corporation*,

Plaintiffs,

v.

POLARIS INDUSTRIES INC., *a Minnesota Corporation*, and POLARIS INDUSTRIES INC., *a Delaware Corporation*,

Defendants.

**MEMORANDUM OPINION AND ORDER**

---

**Civil No. 13-3595 (JRT/FLN)**

POLARIS INDUSTRIES, INC., *a Delaware Corporation*,

Plaintiff,

v.

ARCTIC CAT INC., *a Minnesota corporation*,

Defendant.

---

Ann N. Cathcart Chaplin, John C. Adkisson, and Joseph A. Herriges, **FISH & RICHARDSON PC**, 60 South Sixth Street, Suite 3200, Minneapolis, MN 55402, for Arctic Cat, Inc. & Arctic Cat Sales Inc.

Alan G. Carlson and William F. Bullard, **CARLSON CASPERS VANDENBURGH LINDQUIST SCHUMAN PA**, 225 South Sixth Street, Suite 4200, Minneapolis, MN 55402, for Polaris Industries, Inc.

These two cases arise out of patents owned by Polaris Industries, Inc. ("Polaris") related to side-by-side all-terrain-vehicles. After Polaris accused Arctic Cat, Inc. ("Arctic Cat") of infringing those patents, Arctic Cat brought a declaratory judgment action in this

Court seeking a declaration of noninfringement with respect to those patents.  The next day Polaris filed an action, also in this Court, for patent infringement of one of the at-issue patents against Arctic Cat.  Because Polaris did not identify its suit as being related to the declaratory judgment action, the cases were originally assigned to different judges, but have now been reassigned and are both pending before this Court.

In each case, the party denominated as plaintiff moves to dismiss the complaint of their adversary.  Polaris argues that Arctic Cat's complaint must be dismissed because it does not serve the purposes of the Declaratory Judgment Act.  Arctic Cat argues that Polaris' complaint must be dismissed and give way to Arctic Cat's earlier-filed action.  In the alternative, Arctic Cat moves for consolidation.  Polaris also moves to dismiss some of Arctic Cat's claims under Federal Rule of Civil Procedure 12(b)(6).

Because the Court concludes that dismissal is not warranted under either the Declaratory Judgment Act or the first-filed doctrine, the Court will deny the motions to dismiss to the extent they are based on those grounds.  However, the Court will exercise its discretion to consolidate these related actions in the interests of judicial economy and maintenance of consistent results.  Finally, with the exception of the claims for declaratory relief and breach of contract, the Court will grant Polaris' motion to dismiss the claims in Arctic Cat's amended complaint for failure to plead plausible claims for relief.

## BACKGROUND

### I.     THE PARTIES

Arctic Cat is a Minnesota corporation that manufactures and sells recreational vehicles.  (Civ. No. 13-3579, Am. Compl. ¶ 1, Apr. 29, 2014, Docket No. 10.)[1]  Polaris is also a Minnesota-based company engaged in the manufacture and sale of recreational vehicles.  (*Id.* ¶ 3, Ex. D.)  Specifically, of relevance to the present lawsuits, both Arctic Cat and Polaris manufacture side-by-side all-terrain-vehicles.  (*See id.*, Ex. D.)  Polaris has obtained a number of patents protecting various aspects of its "RANGER RZR" side-by-side all-terrain vehicles which are the subject of these lawsuits.  (*Id.* ¶ 6, Ex. D.)

### II.    PRE-SUIT DISCUSSIONS

The events that precipitated the two lawsuits began with a letter dated December 3, 2013, in which an attorney representing Polaris with regard to patent matters gave Arctic Cat's president "notification of claims of patent infringement by Arctic Cat, Inc." (*Id.*, Ex. D at 2.)[2]  The letter indicated that Polaris had reviewed Arctic Cat's Wildcat and Wildcat 4 vehicles and "concluded that they infringe Polaris' U.S. Patent No. 8,596,405 . . . which issued today, December 3, 2013." (*Id.*)  With respect to other patents, the letter explained that "based upon photos and other information obtained [about Arctic Cat's newly introduced vehicle, the Wildcat Trail], we believe that it too

---

[1]  Because civil case number 13-3595 does not contain an amended complaint, all references to the amended complaint in this Order refer to the amended complaint filed in civil case number 13-3579, and will be cited without reference to the case number.

[2]  All references to page numbers are to the CMECF pagination.

will infringe upon at least one or more of the claims of Polaris' U.S. Patent Nos.

7,819,220; 8,382,125; 8,596,405; or one or more of the claims of Polaris' pending

published patent applications; for example, US 20080023240 or US20130161109." (*Id.*)

The letter noted that it was providing "formal Notice of the Polaris Patents that creates an

affirmative duty for Arctic Cat to investigate such Polaris Patents in relation to the

products mentioned herein" explaining:

> We ask that you immediately evaluate the vehicles referred to herein, and,
> if you disagree with our conclusions, report to us your detailed conclusions.
> We also hereby demand that your company cease and desist making, using,
> offering for sale, selling, or importing any product that infringes upon our
> client's rights, including the Arctic Cat Vehicles referred to above.
>
> We would like to reach an amicable, but immediate, resolution with Arctic
> Cat.  However, given the seriousness of this matter, we request a prompt
> written response from you no later than: **December 20, 2013.**
>
> If we do not receive a timely and complete affirmative reply to this Notice,
> we will so advise Polaris to consider pursuing the various legal remedies
> available to them as a consequence of Arctic Cat's unauthorized actions,
> including the right to seek damages, injunctive relief, and the recovery of
> legal fees.

(*Id.*, Ex. D at 2-3 (emphasis in original).)

On December 17, 2013, Arctic Cat responded to the letter explaining that it was in

the process of reviewing Polaris' patents and Arctic Cat's products referenced in the

December 3 letter.  (Civ. No. 13-3579, Decl. of Alan G. Carlson, Ex. A, May 13, 2014,

Docket No. 18.)  Arctic Cat's counsel stated:

> My intent is to form meaningful (if initial) conclusions in the very short
> term.  That said, I'd like to have an initial discussion with you tomorrow, if
> possible, so that we can discuss how best to proceed.  One thing I'd like to
> discuss is whether it makes sense for the parties to enter into a Rule 408-
> type agreement to facilitate open discussions.

(*Id.*, Ex. A at 2.)  The next day, Arctic Cat requested an extension of the December 20, 2013 deadline by which to respond to Polaris' infringement determinations.  (Am. Compl. ¶ 17.)  Polaris denied the request.  (*Id.*)

## III.   THE LAWSUITS

### A.   Arctic Cat's Lawsuit

On December 19, 2013, "rather than be held hostage by the uncertainty created by Polaris's vague and unsubstantiated attacks" (Am. Compl. ¶ 18), Arctic Cat filed a lawsuit ("the Arctic Cat lawsuit") seeking a declaratory judgment of noninfringement – based on the allegations in Polaris' December 3 letter – with respect to three patents: Patent No. 8,596,405 ("the '405 Patent"), Patent No. 7,819,220 ("the '220 Patent"), and Patent No. 8,382,125 ("the '125 Patent") (Civ. No. 13-3579, Compl., Dec. 19, 2013, Docket No. 1).  The Arctic Cat lawsuit was initially assigned to Chief Judge Michael J. Davis and Magistrate Judge Franklin L. Noel.  (Civ. No. 13-3579, Notice of Initial Case Assignment, Dec. 20, 2013, Docket No. 4.)

The next day Arctic Cat sent an email to Polaris, notifying Polaris of the declaratory judgment action that Arctic Cat had filed.  (Civ. No. 13-3579, Carlson Decl., Ex. B.)  Arctic Cat's counsel explained:

> Arctic Cat would have preferred discussing with Polaris an early and amicable resolution.  That said, Polaris' demand that Arctic Cat produce (on extremely short notice) a formal, written non-infringement and/or invalidity opinion on Polaris' three patents and two pending applications, and do so in light of multiple vehicles, was, in Arctic Cat's view, neither possible nor calculated to be reasonable.  Polaris' refusal to offer a modest extension to its arbitrary deadline underscored our concern that Polaris was not interested [in] pursuing an amicable resolution.

(*Id.*, Ex. B at 2.)  Arctic Cat also indicated that it had analyzed the issues and determined that Arctic Cat's products did not infringe Polaris' patents, and that "Arctic Cat is still interested in resolving this matter amicably and in the short term."  (*Id.*)

## B.    Polaris' Lawsuit

On December 20, 2013, Polaris filed its own lawsuit in this District against Arctic Cat ("the Polaris lawsuit").  (Civ. No. 13-3595, Compl., Dec. 20, 2013, Docket No. 1.)  In its complaint, Polaris brought a single claim for patent infringement against Arctic Cat, alleging infringement of the '405 Patent.  (*Id.* ¶¶ 10-15.)   In the civil cover sheet accompanying Polaris' complaint, it left blank the section for listing "related case(s) if any."  (*Id.*, Attachment 2.)[3]  The Polaris lawsuit was initially assigned to Judge Joan N. Ericksen and Magistrate Judge Steven E. Rau.  (Civ. No. 13-3595, Notice of Initial Case Assignment, Dec. 23, 2013, Docket No. 3.)

---

[3] Arctic Cat makes much of Polaris' failure to designate the Arctic Cat lawsuit as a related case, and appears to argue that Polaris' civil cover sheet violated the Local Rules.  (*See, e.g.*, Civ. No. 13-3579, Arctic Cat's Mem. in Opp'n to Mot. to Dismiss at 5, June 3, 2014, Docket No. 27.)  Arctic Cat has not, however, cited to any particular rule that was violated, or explained what consequences should result from any such rule violation.  It appears that the only rule potentially implicated by Polaris' failure to designate the related case is Local Rule 3.1, which governs the filing of the civil cover sheet.  The rule provides that "[a] completed civil cover sheet must accompany every document initiating a civil action."  D. Minn. LR 3.1.  But the rule also states that "[b]ecause the cover sheet is solely for administrative purposes, matters appearing only on the cover sheet have no legal effect."  *Id.*  Accordingly, to the extent that Polaris' failure to identify a clearly related case in its cover sheet could be construed as a violation of Local Rule 3.1, the Court finds that such a failure has no legal effect on the proceedings and therefore has not considered this failure in ruling on the instant motions.

## IV.    POST-FILING SETTLEMENT DISCUSSIONS

After the parties filed their lawsuits, they agreed to discuss a resolution of the patent issues.  (Am. Compl. ¶ 19.)  Prior to the discussions, Arctic Cat informed Polaris that it possessed "significant prior art [related to the patents] that Polaris had not previously submitted to the Patent Office," and had "engineering drawings demonstrating that the Arctic Cat products did not infringe" the at-issue patents.  (*Id.*)  Polaris' counsel – Mr. Groen – "requested, purportedly for the purposes of advancing settlement discussions, that [Arctic Cat's counsel] provide this information to Polaris."  (*Id.*)  Arctic Cat alleges "on information and belief" that "Polaris had no intention of engaging in good-faith settlement negotiations."  (*Id.* ¶ 20.)

On January 21, 2014, the parties entered into a Negotiation Agreement pursuant to Federal Rule of Evidence 408 ("the Negotiation Agreement").  (*Id.* ¶ 21, Ex. E.)  "The purpose of the Negotiation Agreement was to maintain the confidentiality of information disclosed during the parties' settlement discussions."  (*Id.* ¶ 21.)  The Negotiation Agreement defines confidential information broadly as "any information, written or oral, which relates to the business, products, processes, or services of any Party," except "information which was already known to the receiving Party," "information ascertainable or obtainable from public or published information," "information received from a third Person not known by the receiving Party to be employed by or affiliated with the disclosing Party" and "information which is or becomes known to the public other than through a breach of this Agreement."  (*Id.*, Ex. E at 3.)  With respect to what

materials are deemed confidential information, the Negotiation Agreement further provides:

> Until such time as a Party serves and provides notice to counsel of service of any Complaint filed by a Party as for the date of this Agreement in the United States District Court for the District of Minnesota, all written materials, including emails, exchanged or disclosed between counsel for the Parties shall be deemed Confidential Information, whether or not marked as confidential.  Written materials exchanged by the parties after service shall be deemed Confidential Information if marked as Confidential Information.

(*Id.*)  The Negotiation Agreement provides that "[t]he Parties will hold the Confidential Information in complete confidence and will not, without the written consent of all Parties, disclose it in whole or in part or use it for any purpose other than the [settlement] Discussions."  (*Id.*)  The parties also agreed that discussions undertaken pursuant to the Negotiation Agreement "shall not be used for any purpose in litigation between the Parties."  (*Id.*, Ex. E at 2.)

On January 22, 2014, the parties met to discuss Polaris' patent infringement allegations.  (Am. Compl. ¶ 24.)  As of January 22, neither Polaris nor Arctic Cat had served the opposing party with the complaints filed in the lawsuits.  At the meeting, Arctic Cat provided Polaris with copies of the documents it had previously agreed to provide – including engineering drawings of the allegedly infringing Arctic Cat product and prior art references.  (*Id.* ¶ 25.)  Arctic Cat alleges that its attorney "expressly stated that disclosing this Confidential Information was a 'leap of faith,' even with the Negotiation Agreement in place, because he was giving the materials to the one person in the world – Polaris's patent prosecution counsel . . . – who was in the best position to misuse the Confidential Information during the prosecution of Polaris's pending patent

applications." (*Id.*)  Arctic Cat alleges that after it provided Polaris with these materials, Polaris indicated that it needed additional time to consider the materials, and "would get back to Arctic Cat to schedule a follow-up settlement meeting," but that "Polaris never contacted Arctic Cat again to discuss settlement." (*Id.* ¶¶ 26-27.)

On February 3, 2014, Polaris disclosed to the Patent and Trademark Office ("PTO") certain prior art that Arctic Cat had provided to Polaris at the settlement meeting.  (*Id.* ¶ 28, Ex. F.)  The disclosure was made in connection with Polaris' patent application 11/494,890 ("the '890 application").  (*Id.* ¶ 28, Ex. F at 2.)  In the supplemental information disclosure statement Polaris indicated that it was "enclos[ing] three pieces of alleged prior art which were recently provided by a third party as potentially relevant to the present application.  Although Polaris believes these references to be cumulative to other references submitted and consider[ed] by the Examiner, out of an abundance of caution Polaris is bringing these references to the Examiner's attention." (*Id.*, Ex. F at 2.)  Polaris did not "seek or receive Arctic Cat's consent to make the disclosure." (*Id.* ¶ 29.)  Polaris re-submitted some of these pieces of prior art to the PTO on April 10, 2014, because the initial submissions had been insufficiently legible and not adequately dated. (*Id.* ¶ 33, Ex. G at 3.)

Arctic Cat alleges that it attempted to contact Polaris on April 3, 2014, to reinitiate settlement discussions, but was informed that the matter had been transferred to a different attorney. (*Id.* ¶ 32.)  When Arctic Cat contacted that attorney, it received no response. (*Id.*)

## V.     POLARIS' CONDUCT BEFORE THE PTO

A number of Arctic Cat's claims arise out of its allegations that Polaris, its inventor of the at-issue products, Aaron Deckard, and its prosecuting attorney, Eric Groen, engaged in misconduct in prosecuting certain of Polaris' patent applications and issued patents.  (*See id.* ¶ 35.)  Those allegations are recited briefly here, and are explored in more detail in the context of Polaris' motion to dismiss these claims under Rule 12(b)(6).

Arctic Cat claims that Polaris engaged in misconduct by failing to disclose prior art.  Specifically, Arctic Cat alleges:

> By at least May 2004, Polaris had constructed a fully operational model of an all-terrain vehicle that, on information and belief, met all the limitations of at least claim 1 of the '220 patent.  Polaris called this vehicle the "Vista."  As of May 2004, Mr. Deckard was aware of Polaris's Vista vehicle.  In fact, Mr. Deckard stated in an August 1, 2012 declaration submitted to the PTO during the prosecution of the '125 and '405 patents that the Vista vehicle was "used in the development of the Ranger RZR," the Polaris product that Polaris itself claims embodies each of the three Patents in Suit.

(*Id.* ¶ 39 (citing *id.*, Ex. H).)  On May 19 through 23, 2004 Polaris performed a research study at the Mounds ORV Park in Flint, Michigan, using the Vista.  (*Id.* ¶ 40, Ex. H.) During this study sixty-five paid participants tested the Vista, filled out post-test questionnaires, and participated in post-test interviews.  (*Id.* ¶ 40, Ex. H.)  The research study was organized by Gongos and Associates – a consumer research and marketing firm – in an attempt, alleges Arctic Cat "to gauge consumer demand and aid Polaris in devising its marketing strategy for the fully functional Vista vehicle."  (*Id.* ¶ 41, Ex. I.) Arctic Cat alleges that despite its knowledge of the Vista, Polaris failed to disclose the Vista as prior art during prosecution of the '220 Patent and that "[h]ad the PTO examiner

been fully apprised of the information regarding the public use of the Vista vehicle, the PTO examiner would not have allowed at least claim 1 of the '220 patent." (*Id.* ¶ 44; *see also id* ¶¶ 43, 45-50.)   Arctic Cat also alleges that Polaris misrepresented the scope of other items of prior art during prosecution. (*See id.* ¶¶ 59-61.)

Additionally, Arctic Cat alleges that Polaris engaged in a pattern of deceptive conduct in front of the PTO by representing that the '405 and '125 Patents were continuations of an earlier patent application number 11/494,891 ("the '891 application"), which application led to the issuance of the '220 Patent. (*Id.* ¶¶ 51-54, Exs. J-K.) Specifically, Arctic Cat alleges:

> In the ['891 application], the specification states that 'Universal joint 144 connects coupler 142 to front drive shaft 146 which powers the front wheels of ATV 10 **through a front differential**.' However, in the applications that led to the issuance of the '125 and '405 patents, the specification states 'Universal joint 144 connects coupler 142 to front drive shaft 146 which powers the front wheels of ATV 10.' In other words, the specification of the applications that led to the issuance of the '125 and '405 patents is broader than the specification that led to the issuance of the '220 patent because it does not limit the front drive shaft to powering the front wheels of the vehicle through a front differential.

(*Id.* ¶ 56 (emphasis in original) (citing *id.*, Exs. L-N).)

## VI.   PROCEDURAL HISTORY

On April 11, 2014, both parties served their respective complaints. (Civ. No. 13-3579, Summons Returned Executed, Apr. 11, 2014, Docket No. 6; Civ. No. 13-3595, Summons Returned Executed, Apr. 11, 2014, Docket No. 11.)

On April 28, 2014, Polaris notified Arctic Cat that it intended to file a motion to dismiss the Arctic Cat lawsuit and instructed Arctic Cat to let Polaris know "by no later

than 10am tomorrow morning whether Arctic Cat will stipulate to this motion. Otherwise, we will assume that Arctic Cat intends to oppose the motion." (Civ. No. 13-3579, Carlson Decl., Ex. C at 2.) The next day, Arctic Cat filed an amended complaint in the Arctic Cat lawsuit adding claims for breach of contract, fraud, unenforceability of the '220, '125, and '405 Patents based on Polaris' inequitable conduct, and monopolization or attempted monopolization of the market for certain recreational vehicles. (*See generally* Am. Compl.)

The parties met and conferred regarding motions to dismiss on April 29. After the meet and confer, Polaris sent an email confirming that at the meet and confer it had asked Arctic Cat to dismiss its complaint and proceed in the Polaris lawsuit or in the alternative agree to transfer the Arctic Cat lawsuit to Judge Ericksen and consolidate the cases. (Civ. No. 13-3579, Decl. of Joseph A. Herriges, Ex. B at 4-5, June 3, 2014, Docket No. 28.) Arctic Cat disputed this representation of Polaris' request, noting that it had not been asked to transfer its case to Judge Ericksen and only disagreed to consolidation with the Polaris lawsuit to the extent such consolidation would result in the Polaris lawsuit being listed as the first-filed case in the consolidated action. (*Id.*, Ex. B at 4.) Arctic Cat inquired whether Polaris would be willing to dismiss the Polaris lawsuit and file its patent infringement claims as counterclaims in the Arctic Cat lawsuit and also whether, in the alternative, Polaris would be willing to consolidate the two cases, with the Arctic Cat lawsuit and case number being listed first. (*Id.*) Arctic Cat put forward a proposal whereby (1) neither party would dismiss its case, (2) the parties would consolidate the cases, (3) the consolidated case caption would list Arctic Cat's lawsuit first, (4) two sets

of pleadings would remain "but the parties would consider streamlining the cases once the pleadings are closed," (5) the parties would leave unresolved issues of which side would present first at trial "[h]owever, Arctic Cat would be able to argue that it should go first at trial since it had the first filed case," and (6) the parties would agree not to file motions to dismiss each other's complaints based on arguments that the other's complaint violated the first-filed rule or was anticipatory, preemptive, or duplicative. (*Id.*, Ex. B at 3.) Polaris did not agree to this proposal.

On May 1, 2014, Polaris filed a letter in the Arctic Cat lawsuit alerting the Court that both the Arctic Cat and Polaris lawsuits involved a common patent and were therefore related cases. (Civ. No. 13-3579, Letter, May 1, 2014, Docket No. 12.) Arctic Cat responded that this letter "is simply a motion for consolidation in improper letter form," and requested "that the Court not take any action as a result of Mr. Carlson's letter, and that the issue of consolidation be addressed through Arctic Cat's motion or through stipulation or other motion practice." (Civ. No. 13-3579, Letter, May 2, 2014, Docket No. 13.) After these letters were filed, Chief Judge Davis recused from the case, and it was reassigned to the undersigned. (Civ. No. 13-3579, Order of Recusal, May 6, 2014, Docket No. 14.)

On May 2, 2014, Arctic Cat filed a motion to dismiss or in the alternative, motion to consolidate cases in the Polaris lawsuit. (Civ. No. 13-3595, Mot. to Dismiss, May 2, 2014, Docket No. 17.) On May 13, 2014, Polaris filed its own motion to dismiss Arctic Cat's amended complaint in the Arctic Cat lawsuit. (Civ. No. 13-3579, Mot. to Dismiss, May 13, 2014, Docket No. 15.)

On May 15, 2014, the Polaris lawsuit was reassigned from Judge Ericksen to the undersigned due to the related nature of the cases. (Civ. No. 13-3595, Order Reassigning Case, May 15, 2014, Docket No. 23.) Arctic Cat then sent Polaris an email inquiring "[n]ow that both cases have been assigned to Judge Tunheim, does that affect Polaris's response to Arctic Cat's proposal . . . to consolidate the two cases? We would still be willing to discuss if so." (Civ. No. 13-3579, Herriges Decl., Ex. B at 2-3.) Polaris replied:

> Arctic's DJ action was precipitous, unnecessary, filed in bad faith, and did not arise from facts the DJ statute was designed to serve.
>
> Sure, Judge Tunheim could take a pragmatic approach, say "boys will be boys," and figure out a way for us to stumble through both cases. But I trust that won't happen because lawyers are not boys and lawyers should not abuse the judicial system.
>
> We believe the facts should cause Judge Tunheim to dismiss the DJ action, instead of condoning Arctic's conduct by continuing Arctic's case, with, as you propose, "Arctic Cat's case listed first." Polaris believes there should be only one civil action. Please dismiss the Arctic case.

(*Id.*, Ex. B at 2.) Arctic Cat refused to dismiss its lawsuit, and both motions to dismiss are currently pending before the Court.

## ANALYSIS

## I.   DISCRETIONARY MOTIONS TO DISMISS

Polaris argues that the Arctic Cat lawsuit should be dismissed in its entirety under the Court's discretionary authority because the declaratory judgment claims filed by Arctic Cat "are the result of gamesmanship by Arctic Cat," and the Arctic Cat lawsuit therefore does not serve the purposes of the Declaratory Judgment Act. (Civ. No. 13-

3579, Polaris' Mem. in Supp. of Mot. to Dismiss at 15, May 13, 2014, Docket No. 17.)

Arctic Cat argues in its own motion to dismiss, that its lawsuit – as the first-filed action –

must proceed and that the Polaris lawsuit should be dismissed.[4]   The Court first examines

the propriety of dismissal under the Declaratory Judgment Act and then discusses the

application of the first-filed rule to the facts and circumstances of these actions.

### A.      Dismissal Under Declaratory Judgment Act

The Declaratory Judgment Act provides the Court with the discretionary authority

to adjudicate declaratory judgment actions, stating that the court "**may** declare the rights

and other legal relations of any interested party seeking such declaration, whether or not

further relief is or could be sought."   28 U.S.C. § 2201(a) (emphasis added).   The

Supreme Court has explained that "[s]ince its inception, the Declaratory Judgment Act

has been understood to confer on federal courts unique and substantial discretion in

deciding whether to declare the rights of litigants."   *Wilton v. Seven Falls Co.*, 515 U.S.

277, 286 (1995); *see also Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d

1377, 1385 (Fed. Cir. 2010) ("[T]he discretion afforded to district courts to administer the

declaratory judgment practice is broad.").   This discretion is vested in the district courts

"in the first instance, because facts bearing on the usefulness of the declaratory judgment

remedy, and the fitness of the case for resolution, are peculiarly within their grasp."

*Wilton*, 515 U.S. at 289.   Pursuant to such discretion, the Court is empowered, even

---

[4] Although the issues are interrelated, this Order first discusses the propriety of dismissal before turning to Arctic Cat's request for alternative relief in the form of consolidation.

where it has subject matter jurisdiction over a declaratory judgment action, "to decline to hear the case." *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 902 (Fed. Cir. 2008).[5] "The use of discretion is not plenary, however, for '[t]here must be well-founded reasons for declining to entertain a declaratory judgment action.'" *Elecs. for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1345 (Fed. Cir. 2005) (alteration in original) (quoting *Capo, Inc. v. Dioptics Med. Prods.*, 387 F.3d 1352, 1355 (Fed. Cir. 2004)). "Absent such reasons, precedent establishes that when there has been a direct charge of infringement by the patentee, and an actual controversy exists due to ongoing activity that has been accused of infringement, the accused infringer has the right to resolve the dispute." *Capo, Inc.*, 387 F.3d at 1355.

In determining whether to exercise its discretion to dismiss a declaratory judgment action the Court "should decide whether hearing the case would serve the objectives for which the Declaratory Judgment Act was created." *Micron Tech., Inc.*, 518 F.3d at 902 (internal quotation marks omitted); *see also Elecs. for Imaging, Inc.*, 394 F.3d at 1345 ("Federal courts must act in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration when declining jurisdiction in declaratory suits." (internal quotation marks omitted)). "When these objectives are

---

[5]   The Court has jurisdiction over Arctic Cat's declaratory judgment claims, which Polaris does not dispute, as the claims present a case or controversy under Article III because the letter created a "definite and concrete" dispute about the parties' legal relationship. *See 3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1376 (Fed. Cir. 2012) (noting that in order to satisfy Article III's case or controversy requirements "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" (internal quotation marks omitted)).

served, dismissal is rarely proper." *Micron Tech., Inc.*, 518 F.3d at 902; *see also Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993) ("When there is an actual controversy and a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory action is not subject to dismissal."), *abrogated on other grounds by Wilton*, 515 U.S. 277.

"A declaratory action allows a party who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side." *Elecs. for Imaging, Inc.*, 394 F.3d at 1345 (internal quotation marks omitted). "[T]he Declaratory Judgment Act was intended to fix the problem that arises when the other side does not sue." *Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*, 497 F.3d 1271, 1284 (Fed. Cir. 2007); *see also Minn. Mining & Mfg. Co. v. Norton Co.*, 929 F.2d 670, 673 (Fed. Cir. 1991) (explaining that the Act was intended "to prevent avoidable damages from being incurred by a person uncertain of his rights and threatened with damage by delayed adjudication"); *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 956 (Fed. Cir. 1987) (explaining "the purpose of the Declaratory Judgment Act, which in patent cases is to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights"). The Federal Circuit has explained that:

> [A] patent owner . . . attempts extra-judicial patent enforcement with scare-the-customer-and-run tactics that infect the competitive environment of the business community with uncertainty and insecurity. Before the Act, competitors victimized by that tactic were rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue. After the Act, those competitors were no longer restricted to an *in terrom* choice between the incurrence of a growing potential liability for patent

> infringement and abandonment of their enterprises; they could clear the air
> by suing for a judgment that would settle the conflict of interests.

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988)

(citation omitted), *overruled on other grounds by MedImmune, Inc. v. Genentech, Inc.*,

549 U.S. 118 (2007).  In other words, under the Act, "[a] plaintiff need not 'bet the farm,

or . . . risk treble damages . . . before seeking a declaration of its actively contested legal

rights.'"  *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 883 (Fed. Cir. 2008)

(alterations in original) (quoting *MedImmune, Inc.*, 549 U.S. at 129).

Polaris argues that Arctic Cat's declaratory judgment action does not serve these

purposes because

> [t]his case is not the result of delay by Polaris or Polaris using "scare-the-
> customer-and-run tactics."  Polaris's December 3 letter proposed an
> immediate resolution of the matter with a concrete deadline of
> December 20, 2013.  This is diligence, not delay.  When Arctic Cat filed
> this case on December 19, Polaris was not delaying – Polaris was waiting
> for Arctic Cat's response. . . . Arctic Cat's choice to strategically bring this
> case one day before the December 20 deadline while Polaris was still
> waiting for a response shows that Arctic Cat was not worried about Polaris
> delaying suit; rather, **Arctic Cat actually was worried about Polaris
> filing suit first**.

(Civ. No. 13-3579, Polaris' Mem. in Supp. of Mot. to Dismiss at 16 (emphasis in

original).)  Polaris also contends that Arctic Cat's action does not serve the purposes of

the Declaratory Judgment Act because Arctic Cat's offer to continue settlement

negotiations the day after filing its lawsuit demonstrates that Arctic Cat was not actually

interested in resolving uncertainty in court.

The Court will decline to exercise its discretion to dismiss Arctic Cat's lawsuit, as

it concludes that the suit satisfies the purposes of the Declaratory Judgment Act.  In its

motion to dismiss Polaris focuses almost exclusively on its lack of delay – arguing that it gave Arctic Cat a firm deadline of December 20 for negotiation and after that Polaris would have sought legal determination of Arctic Cat's alleged infringement.  In other words, Polaris argues that Arctic Cat was not faced with lingering uncertainty about its legal rights because Polaris was going to bring a lawsuit if Arctic Cat failed to respond to the infringement allegations.  But this argument relies heavily on the benefit of hindsight and information regarding Polaris' understanding of what its own next steps would be, to which Arctic Cat was not privy.  In the December 3 letter Polaris stated that if Arctic Cat did not respond by December 20, counsel "will so advise Polaris to consider pursuing the various legal remedies available to them as a consequence of Arctic Cat's unauthorized actions."  (Am. Compl., Ex. D at 3.)  From Arctic Cat's perspective, this was by no means a promise that Polaris would bring a lawsuit to resolve the patent issues.  Instead, Arctic Cat was faced with a situation where Polaris had demanded that Arctic Cat cease producing or selling a line of products.  When negotiations broke down after Polaris refused to allow Arctic Cat additional time to investigate, Arctic Cat was left in a position of stopping production or running the risk of being sued for infringement at some point in the future, a situation the Declaratory Judgment Act was designed to prevent.  *See Danisco U.S. Inc. v. Novozymes A/S*, 744 F.3d 1325, 1332 (Fed. Cir. 2014) ("At bottom, Danisco is in the position of either abandoning its RSL products or running the risk of being sued for infringement, which is precisely the type of situation that the Declaratory Judgment Act was intended to remedy."); *see also Elecs. for Imaging, Inc.*, 394 F.3d at 1345 ("A declaratory judgment action allows a party who is reasonably at legal risk

because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side." (internal quotation marks omitted)).   Furthermore, that Arctic Cat faced the type of uncertainty the Declaratory Judgment Act was designed to prevent is highlighted by the fact that, although Polaris' December 3 letter cited numerous patents and patent applications that were potentially infringed by Arctic Cat's products, to date Polaris has brought a lawsuit with respect to only one of those patents.   Had Arctic Cat not brought the present declaratory judgment action, it would have remained in a state of uncertainty regarding its liability with respect to the other patents referenced in Polaris' letter.

Polaris relies primarily on two cases in support of its argument that the Court should exercise its discretion to dismiss Arctic Cat's declaratory judgment claims.   First, Polaris cites *Fresenius USA, Inc. v. Transonic Systems, Inc.*, 207 F. Supp. 2d 1009 (N.D. Cal. 2001).   In *Fresenius*, counsel for the patent holder – Transonic – sent a letter to Fresenius USA indicating that Transonic had sued a third-party company for patent infringement, that the court in that case had adopted certain claims constructions, and that based on those claim constructions certain of Fresenius USA's products may infringe the same patent.   *Id.* at 1010.   The letter concluded that "Transonic desires to resolve all infringement issues discussed above quickly and amicably.   Therefore, please review the enclosed materials and contact me within two weeks to discuss possible resolutions to these outstanding infringement issues."   *Id.*   Two weeks later, Fresenius USA filed an action seeking a declaratory judgment for noninfringement and invalidity of the asserted patent.   *Id.*   Only then did FU Fresenius USA respond to the letter providing the reasons

for its belief that its products were not infringing.  *Id.* at 1010-11.  Shortly after filing the

complaint the parties engaged in settlement negotiations "at which time [Fresenius USA]

offered to dismiss its complaint if Transonic would agree that it could only sue

[Fresenius USA] in the Northern District of California.  This offer was declined."  *Id.* at

1011 (citation omitted).

After concluding that it lacked subject matter jurisdiction over the action, the

district court in *Fresenius* held, in the alternative, that it would decline to exercise

jurisdiction over the declaratory judgment action because it failed to satisfy the purpose

of the Act of preventing a would-be-infringer from choosing between incurring growing

potential liability for patent infringement and abandoning its business.   The court

explained:

> At the time it filed suit, [Fresenius USA] was not yet faced with any such
> dilemma since this was the first communication from Transonic, and there
> was an outstanding offer to negotiate.  There is no evidence that Transonic
> in any way delayed or intended to avoid filing suit if an amicable resolution
> could not be achieved.   Exercising jurisdiction over declaratory-relief
> actions under such circumstances would create a strong disincentive for
> patentees to communicate with potential infringers before filing suit, for
> fear of being sued first and thus forced to litigate in the defendant's forum
> of choice.

*Id.* at 1012-13.

In addition to not being binding precedent, the Court finds that *Fresenius* is

distinguishable on its facts from the Arctic Cat lawsuit in several material respects.  First,

in *Fresenius* there was an outstanding offer to negotiate at the time the would-be-

infringer filed its declaratory judgment action.   Here, at the time Arctic Cat filed its

lawsuit on December 19, 2013, there was no outstanding offer to negotiate.  At that point

Arctic Cat had communicated to Polaris that in order to engage in the amicable negotiation suggested by Polaris in the December 3 letter, Arctic Cat would need more time, which Polaris refused. Therefore when Arctic Cat filed its lawsuit Polaris had effectively terminated negotiations by refusing to allow Arctic Cat the time it requested to conduct its own investigation of the patents and the allegedly infringing products. Second, Fresenius USA's conduct in *Fresenius* in attempting to negotiate as part of a settlement a guarantee that the patent holder would only bring suit in the Northern District of California clearly indicated an intent to gain a tactical advantage by filing a declaratory judgment action in its preferred forum. This conduct was an important part of the court's reasoning as evidenced by its discussion of the "strong disincentive for patentees to communicate with potential infringers before filing suit, for fear of being sued first and thus **forced to litigate in the defendant's forum of choice**." *Id.* at 1013 (emphasis added). Here, there are no such forum selection considerations. Both Arctic Cat and Polaris filed their lawsuits in the District of Minnesota, and there is no evidence that Arctic Cat attempted to use its lawsuit as a bargaining chip to gain a procedural advantage in terms of forum selection. Therefore, although the facts of *Fresenius* are at first blush similar, the Court concludes that the case does not provide a persuasive basis upon which to dismiss the Arctic Cat lawsuit.

Polaris also relies upon *EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996), *overruled on other grounds by MedImmune*, 549 U.S. 118, *as recognized by Teva Pharm. USA, Inc. v. EISAI Co.*, 620 F.3d 1341, 1349 (Fed. Cir. 2010). In *EMC Corp.*, the Federal Circuit concluded that it was not an abuse of the district court's discretion to

dismiss a declaratory judgment action brought by EMC.  *Id.* at 809.  The district court based its dismissal on two primary reasons: first, the two parties "were involved in negotiations over the sale or licensing of Norand's patents up to the time the complaint was filed" and there was no suggestion that "Norand's participation in the negotiations was merely a pretext designed to give Norand a basis for keeping EMC from obtaining declaratory judgment relief"; second, the circumstances surrounding and immediately following the filing of the complaint – including the fact that the complaint was filed shortly after Norand informed EMC of its plans to enter negotiations with EMC's competitors, and the day after the complaint was filed EMC's counsel called Norand's counsel and reported that the declaratory judgment complaint had been filed as merely a defensive step.  *Id.* at 815.  Based on these facts, the district court concluded that the declaratory judgment sought by EMC did not satisfy the purposes of the Declaratory Judgment Act, explaining that to allow the action to proceed would "create an incentive structure that is inconsistent with the public interest in preserving declaratory proceedings for cases closer to the central objectives of declaratory proceedings" and that "a party in EMC's position could abuse the declaratory judgment device to obtain a more favorable bargaining position in its ongoing negotiations with the patentee and also undermine the value of the patent so as to impede its sale or licensing to a third party."  *Id.* at 814 (alteration and internal quotation marks omitted).  The Federal Circuit affirmed, concluding that "[u]nder these circumstances, the district court could properly view the declaratory judgment complaint as a tactical measure filed in order to improve EMC's

posture in the ongoing negotiations – not a purpose that the Declaratory Judgment Act was designed to serve." *Id.* at 815.

As with *Fresenius*, although *EMC Corp.* shares some relevant facts with the present case, the Court finds it distinguishable from the circumstances surrounding the Arctic Cat lawsuit.  In *EMC Corp.* the parties were engaged in ongoing negotiations at the time the complaint was filed, which, as explained above, is not the case here.   With respect to the impact of ongoing negotiations on the purposes of the Declaratory Judgment Act, the Federal Circuit explained that "a patentee in the midst of active negotiations may not be leaving the other party 'immobile' or 'helpless' and may not be benefiting from the delay.  Instead, the patentee may be attempting to avoid litigation by engaging the other party in extra-judicial dispute resolution." *Id.*  The Federal Circuit also explicitly noted that a would-be-infringer could avoid the problem of dismissal under the Declaratory Judgment Act "simply by cutting off negotiations if it appears that the patentee is not negotiating in good faith." *Id.*  After Arctic Cat requested, and was denied, an extension of time, under the Federal Circuit's explanation of the rule, it was within its rights to cut off the negotiations and seek to determine its legal rights with respect to the at-issue patents.

Furthermore, the *EMC Corp.* decision has two important limitations.  First, *EMC Corp.* found only that "[i]n light of the limited scope of our review, we cannot conclude that the district court's decision on that issue was so contrary to the teachings and experience concerning the functions and extent of federal judicial power, that it constituted an abuse of discretion." *Id.* (citation and internal quotation marks omitted).

Therefore, *EMC Corp.* does not appear to compel a particular conclusion in this case and certainly does not hold that it would be an abuse of the Court's discretion to refuse to dismiss Arctic Cat's declaratory judgment action. Furthermore, the Federal Circuit has since backed away from the more expansive statements in *EMC Corp.* regarding the use of a declaratory judgment action to obtain a tactical advantage, explaining that even where declaratory suits "have had the effect of placing appellants in a more favorable negotiating position, that effect is not a sufficient reason to decline to hear the suit." *Sony Elecs., Inc.*, 497 F.3d at 1289 (remanding where the district court exercised its discretion to dismiss declaratory judgment action in part because "there is no affirmative evidence to suggest that appellants filed this suit in order to obtain a more favorable bargaining position in any ongoing license negotiations"). In the absence of affirmative evidence such as that found in *EMC Corp.*, where the declaratory judgment action was filed after the patent holder indicated that it was going to begin negotiating licenses with third parties, and the filer of the declaratory judgment action admitted that the action was merely a defensive measure, dismissal is not warranted. Here, Polaris has not presented affirmative evidence that Arctic Cat filed its declaratory judgment action solely to gain a tactical advantage. That it may have incidentally provided an advantage (which advantage Polaris has been unable to articulate) is insufficient to warrant dismissal. Accordingly, the Court concludes that *EMC Corp.* does not require dismissal and will decline to dismiss Arctic Cat's declaratory judgment action because it serves the purposes of the Declaratory Judgment Act.

### B.    First-Filed Rule

Arctic Cat moves for dismissal of the Polaris lawsuit on the basis that the Arctic Cat lawsuit was the first-filed suit.  Polaris argues that the general rule allowing a first-filed suit to go forward does not apply to the facts and circumstances of this case, and that its own lawsuit should be allowed to proceed.

"The 'first-to-file' rule is a doctrine of federal comity, intended to avoid conflicting decisions and promote judicial efficiency, that generally favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012). When two actions that sufficiently overlap are filed in different federal district courts, the first-filed rule provides that the later-filed case is generally to be stayed, dismissed, or transferred to the forum of the first-filed action.  *See Futurewei Techs., Inc. v. Acacia Research Corp.*, 737 F.3d 704, 708 (Fed. Cir. 2013).[6]  The rule applies even where the first-filed action is a declaratory judgment action.  *Micron Tech., Inc.*, 518 F.3d at 904. The first-filed rule is not, however, absolute and "[t]he trial courts have discretion to make exceptions to this general rule in the interest of justice or expediency, as in any issue of choice of forum." *Micron Tech., Inc.*, 518 F.3d at 904; *Merial*, 681 F.3d at 1299 (explaining that even under the first-filed rule "'an ample degree of discretion,

---

[6]   Application of the first-filed rule to determine which of two cases will proceed is a determination sufficiently tied to patent law such that the question is governed by the Federal Circuit's law.  *See Elecs. for Imaging*, 394 F.3d at 1345–46 ("The question whether to accept or decline jurisdiction in an action for a declaration of patent rights in view of a later-filed suit for patent infringement impacts this court's mandate to promote national uniformity in patent practice.  Because it is an issue that falls within our exclusive subject matter jurisdiction, we do not defer to the procedural rules of the regional circuits nor are we bound by their decisions.").

appropriate for disciplined and experienced judges, must be left to the lower courts'"

(quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183-84 (1952)).

In determining whether an exception to the first-filed rule should be made courts

consider, among other factors, "judicial and litigant economy, and the just and effective

disposition of disputes." *Elecs. for Imaging, Inc.*, 394 F.3d at 1347 (Fed. Cir. 2005)

(internal quotation marks omitted).

     The parties do not dispute that the Arctic Cat lawsuit was filed first.  Instead,

Polaris argues that the first-filed rule does not apply in this case because the rule is

designed to determine the proper venue for a dispute – an issue not presented by these

facts where two cases are filed in the same district and assigned to the same judge.

Courts have explained that the purpose of the first-filed rule is "[t]o conserve judicial

resources and avoid conflicting rulings" by "giv[ing] priority, **for purposes of choosing**

**among possible venues** when parallel litigation has been instituted in **separate courts**, to

the party who first establishes jurisdiction." *Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 989

F.2d 1002, 1006 (8th Cir. 1993) (emphases added); *see also Futurewei Techs., Inc.*, 737

F.3d at 708 ("When two actions that sufficiently overlap are filed in **different federal**

**district courts**, one for infringement and the other for declaratory relief, the declaratory

judgment action, if filed later, generally is to be stayed, dismissed, or transferred to the

forum of the infringement action." (emphasis added)); *In re Founds. Worldwide, Inc.*,

542 F. App'x 998, 999 (Fed. Cir. 2013) ("[The first-filed] rule permits a district court to

decline jurisdiction or transfer an action when a complaint involving the same parties and

issues has already been filed **in another district**." (emphasis added)); *Spread Spectrum*

*Screening LLC v. Eastman Kodak Co.*, 657 F.3d 1349, 1357 (Fed. Cir. 2011) (describing the first filed rule as a "general rule that favors **the forum** of the first-filed action (emphasis added) (internal quotation marks omitted)); *Smart v. Sunshine Potato Flakes, L.L.C.*, 307 F.3d 684, 687 (8th Cir. 2002) ("The first-filed factor is often dominant in determining which federal court should proceed when the parties to an arbitration award have filed cross motions to vacate and confirm the award in **different district courts**." (emphasis added)).  These cases overwhelmingly indicate that the first-filed rule is not implicated in situations like this – where a single district judge is confronted with two different cases that raises the same legal issues arising out of common facts.  Instead, the first-filed rule is a venue or forum selection mechanism encouraging dismissal of a later-filed suit in a different district.

That the first-filed rule is not intended to govern the resolution of two lawsuits filed in the same district and assigned to the same judge is further evidenced by the factors that courts are instructed to examine when determining the applicability of the first-filed rule.  For example, courts decline to apply the first-filed rule when compelling circumstances, or red flags are present, such as where "the action was brought as a wrongful preemptive strike or as an attempt at forum shopping," *Hearth & Home Techs., Inc. v. J&M Distrib., Inc.*, Civ. No. 12-686, 2012 WL 5995232, at *3 (D. Minn. Nov. 30, 2012), or the suit "depriv[es] a potential plaintiff of his choice of forum," *909 Corp. v. Village of Bolingbrook Police Pension Fund*, 741 F. Supp. 1290, 1293 (S.D. Tex. 1990).  *See also Micron Tech., Inc.*, 518 F.3d at 904 (explaining that "as in any issue of choice of forum" district courts have discretion when applying the first-filed rule and consider "the

convenience and availability of witnesses, the absence of jurisdiction over all necessary or desirable parties, and the possibility of consolidation with related litigation"). Courts also consider bad faith in determining whether to apply the first-filed rule, indications of which can include "filing a suit in an unnatural forum" or "secretly filing the first-filed declaratory judgment action and keeping the lawsuit secret as a negotiating tool and method to preempt the defendant's choice of forum when it later files suit." *Hearth & Home Techs.*, 2012 WL 5995232 at *5 (alterations and internal quotation marks omitted). Finally, courts consider matters of efficiency and practicality in determining whether the first-filed rule should apply such as "duplicative efforts and costs and . . . inconvenience to the parties, together with the waste of judicial resources inherent in parallel litigation." *Nw. Airlines*, 989 F.2d at 1007. In a situation such as this, these factors make little sense as both parties have chosen the same forum and issues of party convenience and duplicative efforts and costs are not implicated.

Arctic Cat argues that the first-filed rule is applicable in cases filed in the same district, but does not cite, and the Court has not found, any cases in which a court has applied the rule when dealing with two cases pending in the same district before the same judge. Arctic Cat explains that "[i]f anything, the fact that the two cases were filed in the same district cautions against dismissing Arctic Cat's complaint because many of the issues typically present in competing actions in different jurisdictions – for example, forum shopping and witness availability – are not present here." (Civ. No. 13-3579, Arctic Cat's Mem. in Opp'n to Mot. to Dismiss at 17, June 3, 2014, Docket No. 27.) Rather than support the use of the doctrine here, Arctic Cat's argument further

emphasizes the futility of trying to meaningfully apply the first-filed doctrine in this situation.  It is not surprising that few of the concerns counseling against application of the first-filed rule are present, because the rule simply does not apply here.  Instead, as explained below, the Court already has adequate tools to deal with cases involving similar parties and claims filed in the same district through its discretion to consolidate related cases.  Accordingly, the Court concludes that the first-filed rule does not apply to these cases, as they do not present a situation in which the Court must choose between different fora, and will decline to dismiss Polaris' lawsuit on this ground.[7]

## II.    MOTION TO CONSOLIDATE

As an alternative to its argument that the Polaris lawsuit should be dismissed under the first-filed rule, Arctic Cat argues that the case should be consolidated and "expresses no preference as to whether the cases should be consolidated" under the Arctic Cat or Polaris lawsuits.  (Civ. No. 13-3595, Arctic Cat's Mem. in Supp. of Mot. to Dismiss or Consolidate at 13, May 2, 2014, Docket No. 19.)

Under Federal Rule of Civil Procedure 42 if "actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay."  Fed. R. Civ. P. 42(a).  "Rule 42 requires only that there be a common question of law or fact, and consolidation is permissible even if the

---

[7] Because the Court has concluded that the first-filed rule does not apply where, as here, both cases in question are filed in the same district and pending before the same judge, this Order does not address the parties' arguments regarding the existence or lack thereof of red flags or compelling circumstances that could warrant deviation from the first-filed rule.

CASE 0:13-cv-03579-JRT-TNL   Document 60   Filed 10/20/14   Page 31 of 56

claims arise out of independent transactions." *Fratzke v. IC Sys., Inc.*, Civ. Nos. 05-1115, 06-232, 2007 WL 1114155, at *2 (D. Minn. Apr. 13, 2007) (internal quotation marks omitted). But "consolidation is not appropriate if it leads to inefficiency, inconvenience, or unfair prejudice to a party, as the purpose of consolidation is to encourage convenience and economy of administration of cases and avoid unnecessary cost or delay." *Id.* (citations and internal quotation marks omitted); *see also EEOC v. HBE Corp.*, 135 F.3d 543, 550-51 (8th Cir. 1998).

There are few models for consolidation in cases such as these, because most often consolidation occurs in cases where consolidation does not change the orientation of the parties as either plaintiffs or defendants. For example, courts have ordered consolidation where a single plaintiff files two patent-infringement suits against two different defendants where the two suits involve the same patents and same accused products. *See Horton, Inc. v. Kit Masters, Inc.*, Civ. Nos. 08-6291, 08-6292, 2009 WL 8590687, at *1 (D. Minn. Apr. 1, 2009). In such cases, after an order of consolidation, the plaintiff typically files a consolidated complaint against all of the defendants, and the later-filed case is closed. *See Fratzke*, 2007 WL 1114155 at *1 (ordering consolidation, directing plaintiffs to file an amended consolidated complaint, and directing the clerk's office to close the later-filed case).

Here, the parties do not dispute that the two cases involve common questions of law and fact, as both lawsuits relate to the infringement and validity of the same patent. Additionally, although Polaris believes that consolidation is the "wrong remedy" (Civ. No. 13-3595, Polaris' Mem. in Opp'n to Mot. to Dismiss or Consolidate at 23, May 23,

- 31 -

2014, Docket No. 26) this argument is based entirely on its contention that the Arctic Cat lawsuit should be dismissed under the Declaratory Judgment Act.   Other than arguing that Arctic Cat's motion must be dismissed under the Declaratory Judgment Act for gamesmanship – an argument which the Court has rejected – Polaris has raised no substantive objections to consolidation other than a generalized complaint that consolidation would be unfair.   Polaris has not, for example, demonstrated that consolidation would lead to inefficiencies, inconvenience, or unfair prejudice.   At most, Polaris has suggested that consolidation would allow Arctic Cat to present its case first in the event that these claims proceed to trial.   As noted below, however, matters of which party presents first at trial in cases where both sides raise affirmative claims for relief is not an issue decided strictly by the case caption, and instead is a matter left to the Court's discretion to be decided based on considerations of efficiency, witness availability, and possible jury confusion at a time in the litigation when it is clear which claims remain to be tried.   Therefore, Polaris' claim that it will be unable to present its case first at trial does not demonstrate the type of unfair prejudice that would stem from, and therefore counsel against, consolidation.

The Court concludes that it would be unwieldy and unnecessary for both it and the parties to attempt to maintain these two cases separately – issuing different scheduling orders, hearing separate motions, and attempting to avoid inconsistent results with respect to arguments made on the same patents.   Because the cases raise identical issues of law and fact, and consolidation will not result in inefficiencies, inconvenience, or any discernable prejudice, the Court will order the consolidation of these cases.   The Court is

aware that, unlike many cases, these two cases do not present a simple consolidation option. In other words, Arctic Cat and Polaris cannot simultaneously both be defendants and plaintiffs in a single consolidated case. Because the parties have identified no other workable option, the Court will defer to its customary practice in managing related cases, and will consolidate the actions into the earlier-filed Arctic Cat lawsuit. The Court will require Polaris, if it desires to proceed with its claims, to file its infringement complaint as a counterclaim in the consolidated lawsuit. Arctic Cat will be designated as plaintiff and counterclaim defendant, and Polaris will be designated as defendant and counterclaim plaintiff. The Court notes that by ordering consolidation and making these designations, it has made no ruling on which party would present its case first in the event that any of the asserted claims proceed to trial.

## III.    RULE 12(b)(6) MOTION

In addition to its motion for dismissal of the declaratory judgment claims addressed above, Polaris has also moved to dismiss the remaining claims in Arctic Cat's amended complaint on the basis that they fail to state claims under Rule 12(b)(6) and otherwise fail to comply with the pleading standards.

### A.    Standard of Review

In reviewing a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "'claim to relief that is plausible on its face.'" *Magee v. Trs. of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009)).  To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action . . . .'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore must be dismissed.  *Id.* (internal quotation marks omitted).  Finally, Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law."  *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

### B.    Breach of Contract

To state a claim for breach of contract under Minnesota law, a "plaintiff must show (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant."  *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).  Count IV of Arctic Cat's amended complaint brings a claim for breach of contract based upon its allegation that "Polaris breached at least Section 4 of the Negotiation Agreement by disclosing Confidential Information to the PTO without Arctic Cat's written consent.  This constitutes a material breach of the Negotiation Agreement."  (Am. Compl. ¶ 127.)  Polaris argues that Arctic Cat's claim for breach of contract must be dismissed for three reasons.  First, for failure to plausibly allege a breach of contract; second, because the

Negotiation Agreement – if interpreted as Arctic Cat claims – would be unenforceable as against public policy; and finally, because Arctic Cat fails to plead damages.

### 1.  Plausible Claim

With respect to failure to plead a plausible breach of contract claim, Polaris argues that "Arctic Cat's bizarre breach of contract theory is that Polaris breached Section 4 of the agreement by disclosing publicly available prior art," and that this allegation fails to state a claim "because publicly available prior art is not Confidential Information under the Negotiation Agreement."  (Civ. No. 13-3579, Polaris' Mem. in Supp. of Mot. to Dismiss at 24.)  This argument requires the Court to interpret the Negotiation Agreement. The determination of whether a contract is ambiguous and interpretation of an unambiguous contract are questions of law that the Court may decide at the motion to dismiss stage, "but the interpretation of an ambiguous contract is a question of fact for the jury."  *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003).  "A contract is ambiguous if its terms are reasonably susceptible to more than one interpretation."  *Savela v. City of Duluth*, 806 N.W.2d 793, 807 (Minn. 2011).  "The determination of whether a contract is unambiguous depends on the meaning assigned to the words and phrases in accordance with the apparent purpose of the contract as a whole."  *Halla Nursery, Inc. v. City of Chanhassen*, 781 N.W.2d 880, 884 (Minn. 2010).

Polaris' argument that the prior art disclosed to the PTO was not confidential information within the meaning of the Negotiation Agreement focuses on the section of the Negotiation Agreement defining confidential information as "any information, written or oral, which relates to the business, products, processes, or services of any Party" with

the exception of "information ascertainable or obtainable from public or published information." (Am. Compl., Ex. E at 3.)  But in Section 4.4, the Negotiation Agreement provides that prior to service of a complaint in the District of Minnesota "all written materials, including emails, exchanged or disclosed between counsel for the Parties **shall be deemed Confidential Information**, whether or not marked as confidential." (*Id.* (emphasis added).)   This provision conflicts with the definition of confidential information and creates an ambiguity regarding what constitutes confidential information covered by the Negotiation Agreement prior to the time of filing a complaint.  *See Anacapa Tech., Inc. v. ADC Telecomms., Inc.*, 241 F. Supp. 2d 1016, 1023 (D. Minn. 2002) (finding a similar clause which excepted from the definition of confidential information publicly available information, but provided that certain technology, some of which was publicly available "shall be included within the definition of . . . Confidential Information" "ambiguous on its face").  Polaris argues that Section 4.4 relates only to the marking of documents, and not whether those documents are confidential information within the meaning of the Negotiation Agreement in the first instance.  Although that may be one reasonable interpretation of the provision, it is not the only reasonable interpretation dictated by the language of Section 4.4.  Section 4.4 clearly states that all written materials disclosed prior to the filing of the complaint "shall be deemed Confidential Information, whether or not marked as confidential." (*Id.*)  Therefore, based on the plain language alone, the provision could reasonably be interpreted as defining the scope of confidential information based on when it was disclosed between the parties and whether it was marked, rather than whether it was publicly available.  Because the Court

concludes that the Negotiation Agreement is ambiguous, it will deny Polaris' motion to dismiss on this ground.  *See Praktika Design & Projectos Ltd. v. Marvin Lumber & Cedar Co.*, Civ. No. 06-957, 2006 WL 2788182, at *4 (D. Minn. Sept. 26, 2006) ("The Court concludes that the contract is susceptible to more than one interpretation, and that extrinsic evidence must be considered to resolve the ambiguity.  As such, the Court cannot grant defendants' motion to dismiss the breach of contract claim."); *cf. Anacapa Tech., Inc.*, 241 F. Supp. 2d at 1023-24 (examining the facts developed during discovery at the summary judgment stage to determine whether plaintiff's interpretation of the ambiguous contract was reasonable).

### 2.    Public Policy

Polaris next argues that if the Negotiation Agreement could be interpreted as preventing the disclosure of prior art to the PTO it is void as against public policy, because Polaris was under a statutory duty to deal with the PTO in good faith and candor, which includes disclosing information that may be material to patentability, whether or not the information is confidential.

"As a general rule, a contract is not void as against public policy unless it is injurious to the interests of the public or contravenes some established interest of society." *Isles Wellness, Inc. v. Progressive N. Ins. Co.*, 725 N.W.2d 90, 93 (Minn. 2006) (internal quotation marks omitted).  Agreements which encourage violations of federal law have been held to contravene "recognizable public policy."  *See McBrearty v. U.S. Taxpayers Union*, 668 F.2d 450, 450-51 (8th Cir. 1982).  But in general, "[a] court's power 'to declare a contract void for being in contravention of sound public policy is a

very delicate and undefined power, and . . . should be exercised only in cases free from doubt.'" *Katun Corp. v. Clarke*, 484 F.3d 972, 976 (8th Cir. 2007) (alteration in original) (quoting *Hollister v. Ulvi*, 271 N.W. 493, 498-99 (Minn. 1937)).

Although a confidentiality agreement which encouraged Polaris to violate federal law by not disclosing certain information to the PTO may violate public policy, the Negotiation Agreement here did not prohibit such disclosure.  Instead, the Negotiation Agreement merely required Polaris to obtain Arctic Cat's written consent before such disclosure.  Therefore, the Negotiation Agreement is not void on its face because it does not encourage violations of federal law, nor do the allegations in the amended complaint indicate that Arctic Cat refused to give consent upon Polaris' request.  At this stage, therefore, the Court will decline to dismiss the breach of contract claim on the basis that the Negotiation Agreement was void.

### 3.    Damages

Finally, Polaris argues that the breach of contract claim must be dismissed for failure to plead damages.  The Minnesota Supreme Court has, however, "recognized that the plaintiff may not have to allege that the breach caused damages in order to state a claim for breach of contract." *Park Nicollet Clinic*, 808 N.W.2d at 833 n.5 (citing as supportive precedent *Burns v. Jordan*, 44 N.W. 523, 524 (Minn. 1890), but as contrary precedent *Sloggy v. Crescent Creamery Co.*, 75 N.W. 225 (Minn. 1898)).  Because the Minnesota Supreme Court has recognized that a plaintiff need not necessarily plead damages in order to survive a motion to dismiss a breach of contract claim, the Court will

decline to dismiss on this basis.  Therefore, the Court will allow Arctic Cat's claim for breach of contract to proceed.

### C.    Fraud

To state a claim for fraud under Minnesota law, Arctic Cat must allege: (1) a false representation by Polaris of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce Arctic Cat to act in reliance thereon; (4) that the representation caused Arctic Cat to act in reliance thereon; and (5) that Arctic Cat suffered pecuniary damages as a result of the reliance.  *See Valspar Refinish, Inc. v. Gaylord's Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).

The basis of Arctic Cat's fraud claim is that Polaris' counsel's, Mr. Groen, "made a material representation to Arctic Cat that the Confidential Information that Arctic Cat provided Polaris was for the purpose of assisting the parties in understanding their respective positions and working toward an amicable resolution of Polaris's infringement claims and that such information would remain confidential."  (Am. Compl. ¶ 130.) Arctic Cat further alleges that "at the time Mr. Groen made his misrepresentations to Arctic Cat, Mr. Groen never intended to maintain the confidentiality of Arctic Cat's Confidential Information and never intended to amicably resolve the parties' dispute." (*Id.* ¶ 132.)  Arctic Cat alleges that it reasonably relied on Mr. Groen's representations and "[i]f Arctic Cat had known Polaris and Mr. Groen's true intent, that Polaris and Mr. Groen did not intend to maintain the confidentiality of the Confidential Information and had no intent to engage in good-faith settlement negotiations, it would not have

provided the material to Polaris." (*Id.* ¶ 133.)  With respect to damages, Arctic Cat

claims that it was damaged "because Mr. Groen took Confidential Information provided

under the guise of settlement negotiations, and publicly disclosed that Confidential

Information to the PTO in an attempt to bolster a patent application containing allowed

claims that Polaris has accused Arctic Cat of infringing." (*Id.* ¶ 134.)

Although the fraud claim is not a model of clarity, it appears that there are two

distinct misrepresentations that purport to be the basis of the claim.  First is the alleged

misrepresentation that Mr. Groen would maintain the confidentiality of the prior art

disclosed by Arctic Cat.  Second is the alleged misrepresentation that Polaris would

engage in good-faith settlement negotiations.

With respect to the first misrepresentation, Polaris argues that the claim fails

because it fails to allege a duty independent of the Negotiation Agreement.  The

independent duty rule provides that a plaintiff cannot recover damages in tort for an

alleged breach of contract except in "exceptional cases where the defendant's breach of

contract constitutes or is accompanied by an independent tort." *Wild v. Rarig*, 234

N.W.2d 775, 789 (Minn. 1975); *see also Russon v. NCS Pearson, Inc.*, 462 F. Supp. 2d

981, 994 (D. Minn. 2006).  The mere existence of a governing contract between the

parties, however, does not preempt or eliminate the possibility of a tort claim. *AKA*

*Distrib. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998).  If a tort claim is

based on a breach of duty that "is indistinguishable from the breach of contract," the tort

claim will fail, but if "a relationship would exist which would give rise to the legal duty

without enforcement of the contract promise itself," the tort claim is viable. *Hanks v.*

*Hubbard Broad., Inc.*, 493 N.W.2d 302, 308 (Minn. Ct. App. 1992) (internal quotation marks omitted); *see also Constr. Sys., Inc. v. Gen. Cas. Co. of Wis.*, Civ. No. 09-3697, 2011 WL 3625066, at *9 (D. Minn. Aug. 17, 2011).  In other words, "[a] fraud claim independent of the contract is actionable, but it must be based upon a misrepresentation that was outside of or collateral to the contract." *AKA Distrib. Co.*, 137 F.3d at 1086; *see also Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 887 (8ᵗʰ Cir. 2000) ("[A]n independent fraudulent concealment claim will not lie where the fraudulent concealment relates to a promisor's duties under the contract.").

Here, Arctic Cat's first misrepresentation is based entirely on its allegation that Polaris promised to keep certain information confidential (promises contained in the Negotiation Agreement) and failed to do so (in breach of that agreement).  Because the misrepresentation alleged is identical to Polaris' duty of performance under the Negotiation Agreement, the Court will dismiss the fraud claim to the extent it is based upon the alleged misrepresentation that Polaris would keep information disclosed by Arctic Cat confidential.  *See Jones v. W. Union Fin. Servs., Inc.*, 513 F. Supp. 2d 1098, 1101 (D. Minn. 2007) (granting summary judgment on plaintiff's negligence and negligent infliction of emotional distress claims where the claims were based on allegations that defendant "was negligent by failing to deliver the money to the correct person" which was "a breach of duty identical to the breach of contract"); *see also AKA Distrib. Co.*, 137 F.3d at 1087 (finding that a fraud claim was not independent of the contract and its performance where "[t]he fraud claim is that Whirlpool lied when it said AKA would be a distributor for a long time" because "duration was a term of the

contract, and breach of that term was the basis for AKA's time-barred contract claim");
*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19-20 (2d Cir. 1996) (finding representations that the party intended to remit all sums due and owing to plaintiff under a contract "amount to little more than intentionally-false statements" by the party "indicating his intent to perform under the contract" which were insufficient to support a claim for fraud).[8]

With respect to Arctic Cat's second misrepresentation, the Court concludes that this aspect of the fraud claim fails because Arctic Cat has not alleged a false representation of fact by Polaris in accordance with Federal Rule of Civil Procedure 9. Rule 9 provides that, in order to adequately plead a claim for fraud, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *United States ex rel. Raynor v. Nat'l Rural Utilities Coop. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012) (internal quotation marks omitted). In its amended complaint, Arctic Cat has identified no affirmative

---

[8] Arctic Cat does not seriously dispute that a promise to keep information confidential is a duty contained within the Negotiation Agreement. Instead, it argues that its fraud claim is not barred by the independent duty rule because its fraud claim is broader than its breach of contract claim. Specifically, Arctic Cat argues that it alleges misrepresentations about Polaris' intent to use the information for purposes of engaging in good faith settlement negotiations in addition to allegations that Polaris misrepresented that the information would remain confidential. (Civ. No. 13-3579, Arctic Cat's Mem. in Opp'n to Mot. to Dismiss at 33.) That Arctic Cat may have other misrepresentation claims in addition to its claims regarding Polaris' alleged representation that the information would remain confidential is irrelevant to whether the latter representation is contained within the Negotiation Agreement and therefore barred by the independent duty rule.

misrepresentations, of any kind, made by Mr. Groen related to Polaris' intent to engage in good faith settlement negotiations.  Instead, the amended complaint contains allegations that can best be described as Arctic Cat's own commentary and interpretation of various communications and events surrounding the settlement discussions.  The closest the amended complaint comes to identifying an actual statement made by Polaris is its allegation that "Mr. Groen requested, purportedly for the purposes of advancing settlement discussions, that Mr. Okerlund provide this information to Polaris."  (Am. Compl. ¶ 19.)  But this allegation, even accepted as true, does not indicate that Mr. Groen himself made a misrepresentation about Polaris' intent to settle, nor is it a specific description of the misrepresentation that would comport with Rule 9.  Instead, it is Arctic Cat's interpretation of Mr. Groen's request for documents – that it was purportedly for the purposes of advancing settlement discussions.  This allegation, without more, does not identify with particularity a false representation of fact and is therefore insufficient to state a claim for fraud.  Accordingly, the Court will grant Polaris' motion to dismiss Arctic Cat's fraud claim to the extent it is based upon a misrepresentation regarding Polaris' intent to engage in settlement negotiations.

### D.    Inequitable Conduct

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011).  A patent may be rendered unenforceable for inequitable conduct where the patent applicant "(1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material

information, and (2) intended to deceive the [PTO]." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008); *see also Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 999 (Fed. Cir. 2007). The Federal Circuit has recently taken steps to narrow the scope of inequitable conduct claims – heightening the intent and materiality standards after finding that such claims have "plagued not only the courts but also the entire patent system" because "allegations of inequitable conduct are routinely brought on the slenderest grounds" and result in "increased adjudication cost and complexity, reduced likelihood of settlement, burdened courts, strained PTO resources, increased PTO backlog, and impaired patent quality." *Therasense, Inc.*, 649 F.3d at 1289-90 (internal quotation marks omitted).

In Counts VI and VII of the amended complaint, Arctic Cat brings claims alleging that the '220, '125, and '405 Patents which are the subject of its declaratory judgment action are unenforceable as a result of Polaris' inequitable conduct. Specifically, Arctic Cat alleges that "Polaris, including at least named inventor Aaron Deckard, deliberately withheld material prior art from the PTO during the prosecution of the '220 patent, including at least the prior public use of the Vista vehicle, and did so with a specific intent to deceive the PTO." (Am. Compl. ¶ 137.) With respect to the '125 and '405 Patents, Arctic Cat alleges that the subject matter of these patents is not "'sufficiently distinct' from that of the '220 patent to eliminate the taint of Mr. Deckard's inequitable conduct during the prosecution of the '220 patent" and that the '125 and '405 Patents are therefore "unenforceable in view of the inequitable conduct that occurred during the prosecution of the related '220 patent." (*Id.* ¶¶ 141-42.)

Polaris argues that Arctic Cat's inequitable conduct claims must be dismissed for a number of reasons including because the exhibits attached to the amended complaint show that the failure to disclose the Vista was not material and for failure to plead the inequitable conduct claims with the requisite particularity.

### 1.  Materiality

In order to prevail on an inequitable conduct claim arising out of failure to disclose prior art, the Federal Circuit has held that

> as a general matter, the materiality required to establish inequitable conduct is but-for materiality.  When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art.  Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference.

*Therasense, Inc.*, 649 F.3d at 1291.  Therefore, in order to state a claim for inequitable conduct based on Polaris' failure to disclose the Vista during prosecution of the '220 Patent, Arctic Cat's allegations must demonstrate that the PTO would not have allowed at least claim 1 of the '220 Patent had it been aware of the Vista.

The exhibits attached to Arctic Cat's amended complaint demonstrate that after Polaris was sued by another entity who claimed that the Vista was material, Polaris disclosed the Vista during prosecution of the '125 and '405 Patents.  (Am. Compl., Exs. H-I; *see also id.*, Ex. C at 4 (the '125 Patent application showing that the August 1, 2012 declaration of Aaron Deckard, disclosing the Vista, was one of the documents presented to the PTO during prosecution), Ex. A at 4 (the '405 Patent application showing that the August 1, 2012 and January 17, 2013 declarations of Aaron Deckard, disclosing the

Vista, were documents presented to the PTO during prosecution). Despite this disclosure during prosecution, the PTO issued the '125 and '405 Patents, demonstrating that the Vista was not material prior art to those patents, because the PTO allowed the claims even after it had been made aware of the Vista. *See Cornucopia Prods., LLC v. Dyson, Inc.*, 881 F. Supp. 2d 1086, 1100 (D. Ariz. 2012) (finding that a complaint failed to allege materiality where "the file history shows that the patent examiner considered and adequately understood the Japanese patent. The patent nonetheless eventually issued."). Although this disclosure was made after the '220 Patent issued, the amended complaint alleges that the '125 and '405 Patents "claim to have a specification containing the same matter as the '220 patent's specifications" and there are only "minor variations" in the independent claims of the three patents in suit. (Am. Compl. ¶¶ 37-38; *see also id.*, Ex. A at 38 (claim 1 of the '405 Patent), Ex. B at 36 (claim 1 of the '220 Patent), Ex. C at 125 (claim 1 of the '125 Patent).) Because the '125 and '405 Patents are continuations of the '220 Patent and contain the same specification and nearly identical independent claims, the PTO's finding that the Vista was not material to the '125 and '405 Patents would apply with equal force to the '220 Patent. In other words, if the Vista was not material to the issuance of the '125 and '405 Patents – as demonstrated by the PTO's issuance of those patents even after disclosure – it could not have been material to the issuance of the '220 Patent. Therefore, the Court finds that Arctic Cat has failed to plead a material omission of prior art and will dismiss Arctic Cat's claim for inequitable conduct.

Arctic Cat's only arguments with respect to materiality is that it requires fact-finding that is impermissible at the motion to dismiss stage, and that a patentee cannot

cure inequitable conduct by later disclosure.  First, as noted above, the Court's conclusion regarding materiality is based entirely on the allegations in the amended complaint and the exhibits attached to it.[9]  Arctic Cat has alleged that the '125 and '405 Patents are continuations of the '220 Patent and contain the same specifications.  Arctic Cat has also attached materials to its amended complaint showing that even after the Vista was disclosed to the PTO it issued the '125 and '405 Patents, indicating that the Vista was not material as a matter of law.  Arctic Cat's amended complaint contains no allegations demonstrating that the Vista could have been material to the '220 Patent, and accordingly dismissal is appropriate.  Second, Arctic Cat's argument regarding cure is misplaced. The Court's dismissal does not suggest that if the Vista had been material, Polaris' later disclosure of it could have cured the original inequitable conduct.  *See Therasense, Inc.*, 649 F.3d at 1288 ("Unlike other deficiencies, inequitable conduct cannot be cured by reissue or reexamination." (citations omitted)).  Instead, Polaris' later disclosure – which had no impact on the PTO's issuance of Polaris' patents – goes to the issue of materiality and demonstrates that the Vista was not material.

---

[9] The Court notes that Arctic Cat did allege that "[h]ad the PTO examiner been fully apprised of the information regarding the public use of the Vista vehicle, the PTO examiner would not have allowed at least claim 1 of the '220 patent because that information was prior art." (Am. Compl. ¶ 44.)  But "[g]enerally, 'when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.'"  *WINBCO Tank Co. v. Palmer & Cay of Minn. L.L.C.*, 435 F. Supp. 2d 945, 955 (S.D. Iowa 2006) (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998)).  Here, Arctic Cat attached to its amended complaint Polaris' disclosures to the PTO and the patents which issued after those disclosures, indicating that the Vista was not material.  These materials which go directly to the issue of materiality and come from the PTO itself trump Arctic Cat's general allegations.

## 2.    Particularity

Furthermore, even if the exhibits to Arctic Cat's amended complaint did not contradict its assertion that the Vista was material to the '220 Patent, the Court would conclude that Arctic Cat has failed to plead this claim with the necessary particularity. "[I]n pleading inequitable conduct in patent cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009).   With respect to the "what" and the "where" specifically, the Federal Circuit has held that a pleading fails to satisfy the requirements of Rule 9 where it fails to identify, for example, "which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found." *Id.* at 1329.

Additionally, with respect to state of mind, the Federal Circuit has explained that "[t]he relevant 'conditions of mind' for inequitable conduct include: (1) knowledge of the withheld material information or of the falsity of the material misrepresentation, and (2) specific intent to deceive the PTO." *Id.* at 1327.  "Although 'knowledge' and 'intent' may be averred generally," the Federal Circuit "requires that the pleadings allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Id.*  Finally, pleading on information and belief is appropriate "when essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based." *Id.* at 1330.  In sum, "[a] charge of inequitable conduct based on a failure to

disclose will survive a motion to dismiss only if the plaintiff's complaint recites facts from which the court may reasonably infer that a specific individual both knew of invalidating information that was withheld from the PTO and withheld that information with a specific intent to deceive the PTO." *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011). "A pleading that simply avers the substantive elements of inequitable conduct, without setting forth the particularized factual bases for the allegation, does not satisfy Rule 9(b)." *Exergen Corp.*, 575 F.3d at 1326-27.

The Court finds that here, Arctic Cat has failed to adequately allege claims for inequitable conduct. Arctic Cat's claim of inequitable conduct is based on its contention that Polaris failed to disclose the Vista, and that the Vista was material to the issuance of the '220 Patent because it was a public use. (Am. Compl. ¶ 137.) To demonstrate public use, Arctic Cat must show "that the claimed invention was in public use before the patent's critical date." *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009). Therefore, Arctic Cat must allege that the Vista was a public use of the '220 Patent's claim limitations. *See id.* But Arctic Cat's allegations regarding why the Vista was material are not pled with specificity. Arctic Cat alleges only that "[b]y at least May 2004, Polaris had constructed a fully operational model of an all-terrain vehicle that, on information and belief, met all the limitations of at least claim 1 of the '220 patent." (Am. Compl. ¶ 39.) Although pleading on information and belief is permitted, this pleading fails to set forth the specific facts upon which Arctic Cat's belief that the Vista embodies the '220 Patent is reasonably based. In other words Arctic Cat has provided no

allegations regarding its understanding of what features the Vista has that would embody claim 1 of the '220 Patent, and therefore "'how' an examiner would have used this information in assessing the patentability of the claims." *Exergen Corp.*, 575 F.3d at 1330.

Finally, the Court concludes that Arctic Cat has failed to allege deceptive intent on the part of Aaron Deckard with particularity.  Again Arctic Cat alleges only that "[o]n information and belief, Mr. Deckard's failure to disclose this information to the PTO was both knowing and willful, and was specifically intended to induce the PTO to issue patent claims it would not otherwise have issued."  (Am. Compl. ¶ 43.)  But again Arctic Cat has failed to support its pleading based on information and belief with "the specific facts upon which the belief is reasonably based." *Exergen Corp.*, 575 F.3d at 1330-31 (finding a pleading deficient which did not contain specific factual allegations that an individual "decided to deliberately withhold [information] from the relevant examiner").  The heightened pleading standard for inequitable conduct is intended to prevent the claim from "devolv[ing] into a magic incantation to be asserted against every patentee and its allegation established upon a mere showing that art or information having some degree of materiality was not disclosed." *Id.* at 1331 (internal quotation marks omitted).  At most Arctic Cat alleges that Deckard knew of a test of the Vista which he believed did not satisfy the public use standard, did not disclose the Vista to the PTO during prosecution of the '220 Patent, and later brought the Vista to the PTO's attention after litigation regarding the Vista's materiality commenced.  These allegations are insufficient to demonstrate deliberate withholding of information as required by the Federal Circuit's

pleading standards.  Accordingly, the Court will grant Polaris' motion and dismiss Arctic Cat's inequitable conduct claims.[10]

### E.    *Walker Process* **Fraud**

Because a patent is a monopoly, a patent-holder can generally enforce its rights under a patent without fear of antitrust liability.  *Simpson v. Union Oil Co.*, 377 U.S. 13, 24 (1964).   But under the *Walker Process* doctrine "[a] patentee who brings an infringement suit may be subject to antitrust liability for the anti-competitive effects of that suit if the alleged infringer (the antitrust plaintiff) proves . . . that the asserted patent was obtained through knowing and willful fraud."   *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (citing *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)).   To establish fraud on the PTO, a party may assert "either a fraudulent misrepresentation or a fraudulent omission."  *Id.* at 1070.   The misrepresentation or omission alleged "must evidence a clear intent to deceive the examiner and thereby cause the PTO to grant an invalid patent."   *Id.*   With regard to allegations based on fraudulent omissions, "there must be evidence of intent separable from the simple fact of the omission."  *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir. 2007).

---

[10] Because Arctic Cat's allegations regarding the unenforceability of the '125 and '405 Patents are based entirely on its claim of inequitable conduct that occurred during the prosecution of the '220 Patent (*see* Am. Comp. ¶¶ 141-42), the Court will dismiss the inequitable conduct claims with respect to all of the at-issue patents, having concluded that Arctic Cat has not alleged inequitable conduct with respect to the '220 Patent.

Here, Arctic Cat brings a claim for *Walker Process* fraud, based on its contention that Polaris committed fraud on the PTO by "making false representations and/or deliberate omissions of facts material to patentability to the Patent Office." (Am. Compl. ¶ 145.) These omissions are the same omissions that underlie Arctic Cat's inequitable conduct claims, which the Court has already concluded do not adequately allege materiality and intent. Because these allegations do not support a claim for inequitable conduct, they are also insufficient to allege *Walker Process* fraud. *See Dippin' Dots, Inc.*, 476 F.3d at 1346 ("A finding of inequitable conduct does not by itself suffice to support a finding of *Walker Process* fraud, because inequitable conduct is a broader, more inclusive concept than the common law fraud needed to support a *Walker Process* counterclaim. To demonstrate *Walker Process* fraud, a claimant must make higher threshold showings of both materiality and intent than are required to show inequitable conduct." (citation and internal quotation marks omitted)).[11]

### F.    Sham Litigation

In addition to *Walker Process* fraud claims, a plaintiff can also impose antitrust liability on a patent holder through a sham litigation claim, by showing "that the

---

[11] The parties dispute whether the Federal Circuit's heightening of the standard required to demonstrate inequitable conduct in *Therasense, Inc.* means that now a showing of inequitable conduct is sufficient to also show *Walker Process* fraud. *See Cornucopia Prods., LLC*, 881 F. Supp. 2d at 1099 n.4 ("*Therasense* discusses inequitable conduct, which – before *Therasense* – operated on a similar but looser standard than *Walker Process* fraud. *Therasense*, however, raised inequitable conduct to match the standard for *Walker Process* claims based on omissions."). Whether the standards for inequitable conduct and *Walker Process* fraud are now coterminous is irrelevant, as the Court has concluded that Arctic Cat has failed to adequately allege inequitable conduct. In other words, whether *Walker Process* fraud requires a higher showing of materiality and intent or the same level of materiality and intent as an inequitable conduct claim, Arctic Cat has alleged neither.

infringement suit was 'a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.'" *Nobelpharma AB*, 141 F.3d at 1068 (quoting *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)).  The sham exception applies where (1) "the lawsuit [is] objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) "the baseless lawsuit conceals an attempt to interfere **directly** with the business relationships of a competitor through the use of the government **process** – as opposed to the **outcome** of that process – as an anticompetitive weapon." *Prof. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (emphasis in original) (alteration and internal quotation marks omitted).

Arctic Cat brings a claim for violation of the Sherman Act based on Polaris' alleged sham litigation.  Arctic Cat alleges that Polaris' litigation is "objectively baseless" and "motivated by a desire to interfere with Arctic Cat's business relationships."  (Am. Compl. ¶ 151.)  Elsewhere, Arctic Cat alleges that "Polaris's allegations that Arctic Cat has infringed any enforceable claim of any Patent in Suit are both objectively baseless and are made with intent not to properly assert any patent right," and that the litigation is baseless "because no objective litigant could conclude that Polaris's litigation is reasonably calculated to elicit a favorable outcome." (*Id.* ¶¶ 83-84.)

The Court concludes that these allegations are merely a recitation of the elements of a sham litigation claim and do not allege any facts showing that Polaris' lawsuit is objectively baseless.  Arctic Cat has not alleged any facts supporting a claim that no

reasonable litigant could realistically expect success on the merits of Polaris' claim and therefore fails to satisfy the pleading standards. *See Simon Prop. Grp., Inc. v. Palombaro*, 682 F. Supp. 2d 508, 511 (W.D. Pa. 2010) (finding a sham litigation claim to be inadequately pled where the counterclaim alleged only that the opposing party "contacted the U.S. Attorney's Office without cause and . . . filed a baseless lawsuit with the intent of inhibiting competition").  For example, Arctic Cat has not pleaded how its allegedly infringing device does not infringe the patent Polaris has sued upon. *Cf. Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, 960 F. Supp. 2d 958, 979 (D. Minn. 2013) (finding allegations of sham litigation regarding copyrights to be sufficient where the antitrust plaintiff alleged that defendant "did not take the photographs over which it claims copyrights, and that it did not obtain the written assignments of these copyrights from the photographers that are required under the Copyright Act").  Accordingly, the Court will grant Polaris' motion and dismiss Arctic Cat's sham litigation claim.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Polaris' Motion to Dismiss [Civ. No. 13-3579, Docket No. 15] is **GRANTED in part** and **DENIED in part** as follows:

   a. The motion is **DENIED** to the extent it seeks discretionary dismissal of Arctic Cat's claims for declaratory judgment (Counts I, II, and III).

b.      The motion is also **DENIED** with respect to Arctic Cat's claim for breach of contract (Count IV).

c.      The motion is **GRANTED** with respect to Arctic Cat's claims for fraud (Count V), unenforceability of the '220 Patent (Count VI), unenforceability of the '125 and '405 Patents (Count VII), *Walker Process* fraud (Count VIII), and sham litigation (Count IX).  These claims are **DISMISSED with prejudice**.

2.      Arctic Cat's Motion to Dismiss or in the Alternative To Consolidate [Civ. No. 13-3595, Docket No. 17] is **GRANTED in part** and **DENIED in part** as follows:

a.      The motion is **DENIED** to the extent it seeks dismissal of Polaris' complaint.

b.      The motion is **GRANTED** to the extent it seeks consolidation of the above-captioned cases.

3.      The Clerk of Court is directed to consolidate the above cases for all purposes including pre-trial and trial proceedings before Judge John R. Tunheim and Magistrate Judge Franklin L. Noel.  As of the date of this Order, all documents will be filed in civil case number 13-3579.  The caption of civil case number 13-3579 will remain unchanged: Arctic Cat, Inc. and Arctic Cat Sales, Inc. will remain listed as Plaintiffs and Polaris Industries, Inc., both the Minnesota and Delaware corporations, will remain listed as Defendants.

4.      The Clerk is **DIRECTED** to close civil case number 13-3595.

5.      Within twenty-one (21) days Polaris may file its patent infringement claim asserted in civil case number 13-3595 as a counterclaim in the consolidated case. Nothing in this Order should be construed as prohibiting Polaris from filing additional proper counterclaims in the consolidated case.

DATED:  October 20, 2014                              ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                                    JOHN R. TUNHEIM
                                                      United States District Judge